Good morning, ladies and gentlemen. We have a number of cases up for today. We have a case from, an appeal from a jury verdict out of the District of Delaware. We have an appeal from a transfer of an action that started as an appeal from an interference proceeding was filed in the Northern District of California and ultimately transferred to this court. We have an appeal from the Court of Veterans Affairs and an appeal from the Trial and Appeal Board arising out of a reexamination decision. We also have two related cases appealing from decisions of the Merit System Protection Board. These are the last two being submitted on the briefs. The first case up today is case number 15-1992 Comcast IP Holdings v. Sprint Communications Company and Mr. Riopelle. Yes, Your Honor. Did I pronounce that correctly? You want three minutes for rebuttal? Yes, please. Okay. All right, you may begin. May it please the Court, Sprint has raised the following four errors which I would like to discuss today. First, the District Court erred when it construed the term switched telecommunications system in the 008 patent in such a way that it allowed Comcast to argue that packet-based systems are included in the definition of switched telecommunications systems. As the specification in the 008 itself indicated, packet-based systems are fundamentally different than switched telecommunications systems because switched telecommunications systems require a predetermined channel over which a call flows while the hallmark of a packet-based system is that they do not have predetermined channels. Well, isn't the point of the claim construction that it's not an either-or proposition, that you can have a hybrid, essentially? Not for the definition of switched telecommunications systems. If you look at Column 1 of the specification in the 008, the inventor draws a distinction between switched telecommunications system and communications system and explicitly separates out datagram or packet-based systems from being a part of switched telecommunications systems. Again, it isn't the... I'm not sure you answered my question. Oh, I apologize. But I thought that what was happening there is they separate out packet systems that are entirely packet systems. In other words, is there such a thing as a hybrid? I believe there could be a hybrid because it was listed in the specification as specifically not being part of what was part of the invention of the 008. The specification talks about how the computer-based or the packet-based system has to be logically separate from the switched telecommunications system. What the construction that the court imposed, by including elements, by allowing elements of a packet-based system to be included in the definition of a switched telecommunications system, it then undercut the claim language in Claims 1, 13, and 27. What prevents a telecommunications system from having both switches and the datagram-based elements? Nothing prevents it. A telecommunications system can have both elements. However, the patent here does not cover an invention for both elements. The patent here covers an invention in which you can use internet addressing information. In this case, it was domain name system information to get the address information. But the patent claims and the specifications specifically require that that call go from a calling party all the way to a call destination. It can't dip into the switched telecommunications system. Sorry, it can't dip into the packet-based system. The patent does not set up a system in which the packet-based system carries the call. Only the switched telecommunications system can carry the call. I guess the district court read it differently, right, and said that when it talked about a switched telecommunications system, the patent was simply requiring you need switches. And a communications system doesn't necessarily need switches. And so in that sense, that's why communications system as defined and expressed in the spec is something that is a broader concept than switched telecommunications system. It is. And then the other side points out that the definition provided in column one uses the term comprising. Switched telecommunications system comprising switches and a bearer channel, a bearer network. And the specification does, Your Honor, use the term comprising. But you can't include an element after the comprising that undercuts it. And let me use an analogy. You can't have a term vegetarian sandwich comprising bread, cheese, and lettuce and then come and say a sandwich that has meat in it is part of that because meat completely undercuts that. That's exactly what's happening here. I think I agree with you on your analogy. But here in the patent, the whole thrust of the patent, the illustrations, they're all about this combination, some merger and intermixing of telecommunications systems and the Internet in order to transmit calls using IP addresses. So the whole character of the patent is about some mixing and matching. It is. But what it's actually doing is it's using the addressing information from the Internet system to then transmit the call. This is what the claims, the claim language itself, for example, if you look at claim one, to go from a calling party to a call destination over through the switched telecommunications system. So is your argument that you can't have a hybrid for this patent dependent upon your argument about what a call destination is? No. It is not contingent. You've now twice used that as your explanation as to why this can't be a hybrid. Maybe I'm misunderstanding the court's question then. Well, you're saying it can't be a hybrid in this patent because your call destination has to be the end user. So I'm saying is your argument that the call destination has to be the end user, is that necessary to your argument that this can't be a hybrid? It is not, Your Honor. The Supreme Court's position is not contingent that a call destination has to be the end user. The issue here is not a call destination versus the call destination. The issue here, which is a result of the claim construction, is that it can't be a call destination. The issue is a call destination versus no call destination. What Comcast was able to do based on the claim construction was take that and then have calls go from a calling party to any point along the way in the call path. And this rendered the term meaningless as the district court recognized and tried to correct Poe's verdict by giving a claim construction of call destination afterwards. Well, I mean, that's your position. I mean, your friend on the other side is going to argue that no, all the district court did was to say that this, in fact, was the claim construction all along and that it is not simply a situation where it's any point along the system. But on the call destination point, Your Honor, their expert and the evidence they put on was it is any point where a call is routed to. So that is any point along the call path because that's what happens with a call. It gets routed to this point, then it gets routed to this point, and then it gets routed to this point. So it is any single point, any point along the call path, and that's why it rendered it meaningless. If every single point along a call path is a call destination, then there is no call destination. If it's going to be rerouted, it's a call destination. It's a destination for rerouting, right? But I'm not sure there's any rerouting here. The call is going from one point all the way. Eventually, it's going to reach a calling party, hopefully. But the calling party, our position is not contingent upon the calling party. I'm sorry, the called party having to be the call destination. But what happened with the construction here in this case, and which allowed Comcast to argue, is a sprint was found to infringe based on calls that went from a calling party to a box in the middle of Sprint's network. And that's what happened here. And that was allowed by the claim construction on switched telecommunications systems because then they could argue that those calls did not have to go over a traditional switched telecommunications system, but they could have them going over a packet-based system. I think maybe the way to think about this is Comcast proposed and the court accepted that A is a switched telecommunications system. B is a datagram system. It says B is not A. And that's what the court agreed. What Sprint proposed, because they could see what was going to happen, is that A is a telecommunications system, and B cannot be part of A. And that's what Sprint proposed because they saw that that's what they were going to try to do, and that undercuts the claim language and the specification of what was being done here. Because now the effect of this is immense. A patent that was originally covering sending calls over a switched telecommunications system, the traditional system using internet addressing, now covers any telecommunications system that uses any internet addressing anywhere. And it now covers almost all telecommunications systems. And that's what's happening here. This patent now goes over the entire breadth. Can you address the prejudgment interest issue? I can, Your Honor. Let me get to that. The question on the prejudgment interest, the question is clear. Can Comcast recover prejudgment interest for a period of time when two of the three patents at issue did not exist? Go ahead. Let me see if I understand some of the procedures correctly. The parties agreed that there would be a single hypothetical negotiation. For the purpose of your question, I will say yes. Okay. And then the parties also agreed that any award by the jury would be based on a lump sum basis. That is correct. That is correct. So why did you agree to that? I mean, I think that those two – your participation in that really battles against your argument today. And I can understand why the court feels that way. Comcast's position, which the district court agreed to, is that it relies on the hypothetical negotiation and the book of wisdom. And that's what they're basing it on. But the hypothetical negotiation and the book of wisdom are judicial constructs. They are tools used to approximate the damages that occur from infringement. But as judicial constructs, they cannot trump – and that's trump with a small t – they cannot trump the statutory requirement that a patentee cannot collect damages. But even if we accept the proposition that there's a difference between the damages calculation and the prejudgment interest calculation, where you have agreed that the damages for the 9-1-6 would be reflected in a 2006 hypothetical negotiation and a lump sum royalty, why isn't it appropriate for the trial court to award prejudgment interest for the 9-1-6 all the way back to that point in time? That is – we do not object to that. The 9-1-6 is the original patent that – Right. So it's – so you're just objecting to the fact that he referred to those other two patents in the order because the reality is he could have awarded the exact same amount on the 9-1-6. In fact, would have had to have. Well, except that the evidence at trial – Comcast saw $16.5 million, that $15 million of that was attributable to the 008 patent, which didn't exist. Well, the jury obviously didn't accept Comcast's apportionment argument. Instead, the jury awarded 7.5. We don't know if the jury accepted the apportionment argument. Of course we don't know what the jury did because you guys agreed to a lump sum figure and you didn't ask for any kind of special interrogatories about the apportionment. So we can't get into that. All we know is that for the 9-1-6, there was a lump sum amount, putting aside the other two patents. But we don't know what the lump sum amount was for the 9-1-6. We know that all three patents, using the tools, the judicial constructs, the Book of Wisdom, and the hypothetical negotiation, they came up with an approximation of what the damages would be. Those damages were awarded after, not they're based on a construct based before. But now what Comcast has come back and said is we want prejudgment interest in all three of these. And this goes exactly – this is what the Group 1 case stands for. In the Group 1 case, the court said you can't collect damages on a patent that has expired. Sorry, I take it back. You can't collect prejudgment interest on a patent that has expired, and that's exactly what they're trying to do. Prejudgment interest on a patent before it existed. I see that I'm well into my rebuttal. Yes, you are. We'll give you three minutes. Three minutes, and we'll give the other side an extra two minutes if necessary. That's not inviting you to use it, just saying you've got it. I appreciate the boundaries, Your Honor. Good morning and may it please the Court. Matthew Lear of Davis Polk for Comcast. I'm going to deviate from my prepared remarks and get right to the two observations that Judge O'Malley and Judge Chen made with respect to switched telecommunication network. It's crystal clear in the specification that a switched telecommunication network is distinct from a communications system, and a communications system can be a datagram entirely based system. I think that was your point, Judge O'Malley, and you asked the question why can't a switched telecommunication system be a hybrid. It can't. That's precisely what this patent is about, and Judge Chen, you asked the question, isn't that the whole intent of this patent? If you have basically a switched telecommunications system end-to-end, you're sort of undermining the entire point of this patent, which is to merge Internet technology with existing switched telecommunications networks. I guess the other side would say, well, what the real intent is is to use aspects of the Internet computer network to help along a switched telecommunications system. That's purely something like a PTSN. Your Honor, I guess I actually see it differently based on their appeal papers. What they argue in their appeal is that a switched telecommunications system has to be a predetermined bearer channel from end-to-end. They didn't argue that below, and the way I understand that is that they're allowing for no interconnection between a packet-based system and a switched telecommunications network. Your Honor noted that the express definition that was partially agreed to by the parties says that a switched telecommunication network comprises switches, et cetera, et cetera, which of course means under bedrock Federal Circuit law that it can comprise other things. And then the question becomes what other things? We say in our brief that Figure 15 shows the interconnection between a switched telecommunication network and a packet-based system. What are we supposed to take from other places in the spec? I mean, your other side cited to them about how a computer network is distinct from a telecommunications system. Well, as we pointed out, they're almost saying, essentially saying, computer network does not equal telecommunications system. Your Honor, in the section that you're referring to, which is in the summary of the invention, what that's saying is that these URI determining computers are distinct from a switched telecommunications system, but that just goes to setting up a call. It doesn't say whether you can't have a datagram-based system somewhere along the way. It doesn't say in the path of a call. So we don't believe there's any disparagement or disavowal of the hybrid system that Judge O'Malley posited at the beginning. The other place they cite to, Your Honor, is in the background of the invention where they talk about these daisy-chained systems that existed prior to the Lowe inventions. And our point there is what Mr. Lowe and his co-inventors said is these old daisy-chained things, they're different from what we're doing here, and it's not a disavowal. It's exactly the opposite. It's saying let's try to merge the new Internet technologies with old PSTN technologies, and we believe Figure 15 demonstrates that conclusively. Let me turn to call destination unless Your Honors have any other questions about the switched telecommunications system. The other side in their brief pointed out that your reference to PLMNs as allegedly using some database system isn't persuasive because that SS7 is just being used for text messaging and not voice calls. I have to say, Your Honor, that's not my favorite reference for us to support our view. I mean, there is an argument that SMS is in the broad definition of a call. I was wondering if column 2 refers to the SS7 protocol 2 as well. I was wondering if you had any understanding of what column 2 was talking about when it talks about the SS7 protocol for inter-exchange call control signaling. I'll get out over my technological skis quickly. My understanding, Your Honor, is the SS7 is simply a switching mechanism that is utilized to interconnect the systems, and I don't know that it says anything specifically about what a switched telecommunications system is within the meaning of the patent. How do you respond to your friend on the other side when he says that really what you're saying is that it can be anything that's not a pure data system, and if there's even any access to switches, that you would cover it? I think that's probably accurate, Your Honor. I mean, the definition of switched telecommunications system basically says if you have switches, a switched system that is used to initiate a call through a bare channel, that's a switched telecommunications system. The use of the word comprising in the express definition in the specification suggests that there can be other elements. I should pick up on Mr. Riopelle's vegetarian. His point is that the switch has to actually bear the signal to the call destination, right? I believe that's right, Your Honor. All right, but in your proposal, it doesn't. It just has to be somehow involved? In the actual claim language, it's initiating a call or setting up a call. So when you're talking about the switched telecommunications system in the context of the claims, it's talking about initiating a call in 1 and 13 and setting up a call in claim 27. It doesn't say anything about what may happen somewhere down the path of the call as the bare traffic actually traverses whatever network you're on. I did want to take up Mr. Riopelle's vegetarian analogy, and I think with you, Judge Chen, the analogy is fine, but it doesn't apply here. What they're basically doing is, to quote one of my former partners, is they're putting the rabbit in the hat. They say that a switched telecommunications system has to be a predetermined bare channel end-to-end. And because it's that, therefore, it can't include anything else. Well, but that's only if you accept their new definition of what a switched telecommunications system is that you can basically obliterate the word comprising from the express definition in the specification, and that just doesn't make any sense. Was your argument ever that any waypoint along a call path constitutes a call destination? Your Honor, most definitely not. They cite in their brief, well, I should say, they quote in their briefs a number of times any point along the way, any point along the path, any point along the route. The two things that are in the record for the court to look at are the testimony of our expert, Dr. Berger, who testified that it is a place that the system routes the call to, which by definition means there's an IP address that is generated by this DNS signaling that routes the call to a specific destination. In one case, it's the SBC, the Session Border Controller. In another, it's the Media Gateway Controller. In another, it's a convergence server that ultimately generates a MAC address, and those are routed to locations. It's actually captured in the record, and I can probably find the site. In my closing argument, I made the following analogy. The analogy is if you're flying from Philadelphia to Anchorage, Alaska, and you check your bags in, they're going to ask you, is this your final destination when it shows you're going to O'Hare? Because nobody flies directly. You have multiple legs. So in your view, if you have a router that routes the call, is that a call destination at that point? So the touchstone, Your Honor, is is there DNS signaling that is used to create an address that routes the call? So as long as DNS signaling is used at some point before the routing, yes, the call destination is where it is routed to. So the counterexample to their position, I think, is if I'm flying from Philadelphia to Boston, I only have one destination. That's not to say that when I'm flying over Connecticut, that's a call destination. Of course it's not a call destination, and we never argued that. What we argued was it's a place that is routed. Is the call destination the point to which the call is routed to, or is the call destination the point at which the call is routed? I'm not sure. You have a path, you have a router, and it sends it to a different destination. Is this a call destination, or is it here where the router is sitting? It's the place it is routed to, Your Honor, is our position. Well, in some instances it can be both. It could be both, yes. Once you route it to a destination, under your theory, that it needs to be then rerouted. Yes, yes, yes. So their argument is— Why aren't those waypoints as opposed to— I mean, it seems to me that the call destination, the call ends at some point, and regardless of the different routes that the call takes, why isn't that endpoint the call destination? It could be among the call destinations, Your Honor, but, again, these claims are drawn to initiating or setting up a call. And the testimony at trial was that when you ping a session border controller and route it there, that is a call destination. When this patent was on reexamination, they took the position that an intermediate device, an inet phone server disclosed in an RFC, and this is in the record we cite to it, was a call destination. Of course it was, and we didn't dispute that. And the patent office accepted that. The other testimony in the record was that in their own documentation, when they refer to a session border controller, they call it a destination. And our basic point was, look, folks, because it was ordinary meaning that we put to the jury. In the context of a network, network people understand intermediate routed to locations as destinations. There are IP destination addresses that get them there. And that is Mr. Nimi, who they refer to as a Comcast witness, but was really a Sprint fellow. He called this destination, he called Airave 2, a call destination. Of course it's a call destination. So we don't feel, it went to trial on ordinary meaning. There was ample evidence in the record for the jury to accept Comcast's position, which was never any point along a path. That was never our position. Let me turn to parsing. Actually, let me turn first to... Could you turn to parsing right now? Oh, sure. Yes, of course. You know, your side obviously said a bunch of things to convince the patent examiner to let the patent go. And some of those things that your side was saying was that parsing is not translating, parsing is not mapping, etc. And then the examiner accepted those statements. So what am I supposed to do with that? Your Honor, I respectfully disagree with the characterization of what we said to the patent office. During the reexamination, Sprint was arguing that the references that are discussed in the reexamination proceeding, which are not of record, inherently disclosed parsing. So it was an inherency argument. And what our expert said with respect to translating, mapping, look-up tables, and predetermined destinations was in the references that they were citing, which again are not of record here so we can't examine them, did not inherently disclose parsing. So I think that the way your Honor... Respectfully, I disagree. I think the way that your Honor characterized it is broader than what our expert was saying during the reexamination. There aren't quotes in the prosecution history saying that parsing is not the same thing as translating? Parsing is not the same thing as mapping? Your Honor, I confess that it was not the most artful expression, but I think if you look at the totality of the record in the reexamination proceeding, Dr. Haas went on to say it does not inherently disclose parsing. And one can think of many examples where you have translating that doesn't include the specific definition of parsing that the parties agreed to in this case. The same is true for... Let me step back. What we're talking about is what people now refer to as enum. It kind of became synonymous with what the low patents taught on this during trial. And enum, and this is the testimony that they point to, teaches something about mapping. Some people think it is referring to mapping. The patent is very precise in saying that what we're talking about is parsing, and it's a very specific, I would say sub-universe of other methods to correlate one thing to another. So how does enum relate to mapping, for instance? I beg your pardon, Your Honor? So how does enum relate to mapping, for instance? Well, the testimony in the record was from Mr. Nimi that he said at a very high... This is the testimony they point to. He said that at a very high level, enum is essentially a mapping technology. And at the most macro level, Your Honor, I think what they're really saying is you're taking a telephone number and you're in some way correlating it with a domain name. You could do that many, many, many different ways. And what the patent calls for is parsing to do that. And so what our position is mapping can be this giant universe of things, the subset of which is parsing, which is what the patent claims require. And so explain parsing to me. So parsing in this particular case, and I think this isn't disputed, you take a telephone number, you take out all the intermediate dashes, etc., you reverse it, you put dots in between the numbers, and then you append ARPA 164, and that creates a domain. You're describing the defendant's product, right? Correct, Your Honor. I mean... You mean parsing in the patent. So in the patent, all it really says, I mean, it gives a couple of examples of using telephone numbers to do this. And what they basically say in the patent is you can use a deterministic algorithm to do this parsing. And I think a point that Dr. Berger made is, according to a grammar, it's not like what we think of in the English language. It's basically a deterministic set of rules. That's what's required, and I don't think that's frankly disputed. It's not the method of parsing that's at issue, it's whether Sprint can get additional negative limitations read into the claims. Did I answer your question sufficiently, Your Honor? So let me briefly move on to prejudgment interest. Judge Rayna, you put your finger right on the issue. They agreed to a lump sum, and they agreed to a 2006 hypothetical negotiation. That's what was put to the jury. We have no idea, we can speculate, but we have no idea... Just curious, does that necessarily mean that the payout would occur in 2006? When you have a negotiation in 2006, that the jury verdict is $7.5 million? Your Honor, I don't know that I've ever actually thought about when the actual dollars would exchange hands, but yes, I think the payout would be in 2006. Because it's a lump sum. Because it's a lump sum, yes, Your Honor, precisely. So the two things that Judge Rayna, you pointed out, those basically set up the framework, and the cases are clear on the damages side, that the Book of Wisdom says you can look forward, take account of future events, and you're entitled to get damages based on not as of yet issued patents. So the question for the court is, and I believe this is one of first impression, is whether you can get prejudgment interest for that same period. The case that Mr. Riopelle referred to and that was cited in their reply brief for the first time, this Group 1 case, if you actually look at that case, what ended up happening there was the only patent that lived on appeal had been invalid for a period of time for failure to pay maintenance fees. And the district court said, well, you don't get prejudgment interest for this. You're just about out of time. Dead period. Okay. The point is, if you look at the opinion, it's clear that what they were really saying is because you delayed in curing this deficiency that we're not awarding prejudgment interest. It doesn't stand for the proposition that you would not be entitled to it at all. Thank you, Your Honors. Judge O'Malley, you asked a question about parsing and mapping. The accused system that Sprint uses is called ENUM. ENUM stands for E.164 Number Mapping. It is a mapping system, the accused in here. Also, let me address one other issue on the parsing, Judge Chen, going to the specific statements. One thing I don't think we emphasized enough in our briefs, but, for example, let me just give you one example. The PTO initially rejected the 046 patent because the PTO said parsing is any predetermined association. If you look at the record at A2531, Comcast responded to this definition of parsing, and it's important to note that Comcast's response is in a section entitled Meaning of the Term Parsing. That's the section. They are defining parsing in order to get these patents passed reexamination. And they said to the PTO, you are incorrect. And their quote is inconsistent with how one of ordinary skill in the art would understand the term parsing. That is a clear and unequivocal statement made to the PTO so they could get parsing. They said it was not a predetermined association. Well, they said that it's not inherently disclosed by those other types of associational mechanisms, right? I believe the quote that they used in the section entitled Meaning of the Term Parsing was inconsistent with how one of ordinary skill in the art would understand the term parsing. And then they came up with the definition process of analyzing a string according to a set of rules of grammar, right? That's correct. That's the affirmative statement. And both parties agreed below that that's the affirmative statement. I don't want to go under false colors here. Right. And then what gets a little messy and nebulous is trying to figure out, okay, well, what does translating really mean and what does mapping really mean? And so how would Judge Andrews even instruct the jury in terms of trying to figure out what more needs to be said beyond the affirmative definition to cabin in and define? Well, I think if he had accepted Sprint's proposed construction, which tracked the very language that Comcast used before the PTA. This wasn't language we made up. We tracked Comcast's language. I think if he had done that, because what it allowed Comcast to do is say parsing is not predetermined association, parsing is not mapping, parsing is not translating, and then come into the court. The court rules that we don't get to put on evidence about that because they ruled out our claim construction. And so then they argue to the jury this system, which is translating or a predetermined association, infringes. Well, the problem is that you wanted the court to have these negative limitations with no qualification. I mean, frankly, had you asked the court to say it's not mapping without more detail, or it's not mapping without additional sets of rules of grammar or use of additional sets of rules of grammar, but you didn't ask for that. You asked for blanket exclusions, and the trial court said there's no basis for those blanket exclusions. The affirmative definition that the court used was part of our proposal, actually. It was not part of Comcast's proposal. But they agreed with it. They agreed with it at the argument. All we were asking, we were... But their proposal, the word grammar wasn't in it, but the set of rules was exactly the same. Right. The language we were trying to do to stay true to what Comcast had said to the PTO was we used their language. We believed the proper thing to do is this is the language Comcast used before the PTO to get past the prior art problems, and so that same language should be used here now that they're trying to claim infringement. Okay. Before you sit down, let me just... On call destination, you never asked for a construction of call destination, right? No, both parties. You agreed that it should go to the jury with ordinary meaning. Ordinary meaning. So what you're asking us to say is that no reasonable juror, in light of all the testimony proffered, could ever conclude that call destination was anything other than the end point. No, Your Honor. No. This is, again, this is not an issue of we're saying that it's a destination versus the destination. This is an issue of a destination versus no destination. They have rendered the claim, the term meaningless. But you're still asking us to say that no reasonable juror could possibly have found that these interim points were call destinations. That's the only way you can win on this point because you didn't ask for a construction of a claim. That is not our position. It becomes a factual determination as to what a call destination is. Our position is that the term has been rendered meaningless. If it goes to the jury and they have to apply an ordinary meaning, they can apply a different meaning, but they have to apply some meaning. They can't render the term meaningless. What if the meaning is location determined by using domain name signaling and maybe not every point along the way is a location that is determined by domain name signaling? That might be possible. That, of course, construction was never presented to the jury. No, but I mean— But there's evidence that was presented to the jury describing it that way. However, there was no evidence presented to the jury that distinguished points along the way that were call destinations from points along the way that were not call destinations. That's why the court, when the court tried to— I've really let you go way too far since I cut him off. I need to cut you off. Thank you, Your Honor. Okay. Thank you.